Maurice Wahl, J.
This is a holdover proceeding to dispossess the tenants, husband and wife, of a co-operative building after alleged termination of their lease for failure to comply with a prohibition against harboring a dog in their apartment.
The tenants are proprietary lessees of an apartment in premises 341 West 24th Street, Borough of Manhattan, New York, which is one of the buildings in the ILGWU group of middle income co-operative apartments which was in large part subsidized and financed with Federal and/or State funds.
Prior to taking possession of their apartment in November, 1962, the tenants owned a pedigreed dachshund which was then approximately 10 years old and had been a member of their household since it was seven weeks old. The puppy was given to them by an aunt of Mr. Hanft who, it is claimed, at great risk to life, person and liberty had returned to her home in German-occupied territory during the persecutions to reclaim the puppy’s grandmother left behind in the haste of flight. The tenants testified that they' were extremely fond of the dog and that it became the prized companion and playmate of their children and later of their grandchildren, some of whom live with them at the present time.
*1046 The evidence shows that, during the extensive period while the tenants lived in the apartment which they occupied prior to moving to the present one, there was no- complaint or objection about their dog by the owner, managing agent or any of the tenants. Consequently, when they purchased an apartment from plans in 1959 they had no reason to believe that there would be any prohibition against or difficulty in taking the dog with them to their new home.
It is not denied that no intimation, suggestion or statement regarding a prohibition against dogs was communicated to them verbally or in writing when the apartment was purchased and a portion of the price was paid. In the interval between purchasing and notification in October, 1962, that the apartment would be ready for occupancy November 29, 1962, no notification was given to them that dogs would not be allowed. During that period, the balance of the purchase price was paid and arrangements to move to the new building were made.
On or about October 27, 1962, they were advised for the first time, and this is not denied, that the lease would contain a provision prohibiting the harboring of a dog. The information was in the form of a letter dated October 26,1962, accompanying the proprietary lease. It stated that the apartment would be ready for occupancy on November 29, 1962, and referred to certain restrictions in the lease, among which was the one relating to dogs.
At that time, the tenants testified, they were in no position economically, emotionally or physically to reverse the course of events. They had notified their landlord that they were moving, and they had parted with some of their possessions which the smaller apartment could not accommodate. The long anticipated move was at hand and they were suddenly confronted with a requirement that they part with one of their dearest possessions. It is alleged that they had no alternative but to sign the lease and move into the apartment and hope that management would not arbitrarily and unreasonably insist upon compliance.
The tenants made no attempt to conceal the presence of the dog. On December 24, 1962, their attorney wrote a letter to Mr. Paul Kurtzmann of ILGrWU Cooperative Houses referring to the regulation in the lease and calling to his attention the fact that Mr. Hanft kept a dog on the premises. The letter mentioned that Mr. Hanft had no knowledge of the restriction prior to receiving the proprietary lease, gave some information about the dog’s ancestry, habits and behavior and ended with the hope that some satisfactory arrangement could be con- *1047 eluded. The letter was not answered but the landlord corporation continued to collect rent for many months after its receipt.
The tenants maintain that the animal is quiet, tidy and completely housebroken. It is never out of the apartment except on a leash and is curbed until it is off the premises of the co-operative corporation and the related group of houses. The dog is now 11 years old, and its span of life cannot be much longer, as this kind of animal rarely survives after 10 years. The tenants have offered to stipulate in any manner that the landlord may require with whatever protective measures it may deem necessary that, upon its death, it will not be replaced by any other dog or pet of any kind.
The court finds no merit in landlord’s contention that a tenant, by subscribing to the stock of this co-operative, may receive only a nonproprietary lease. The very nature of a co-operative is that, because of the capital investment, the tenant becomes a proprietary pro rata owner and as such is entitled to a “ proprietary lease.” Were it otherwise, we would have the anomalous fact that the tenant is paying in effect a premium for his lease. The mere ownership of stock in such a co-operative corporation finds no ready market. The net result, if landlord is correct herein, would be nothing more than the creation of a deduction for tax purposes. In one breath, the landlord states that the benefits of co-operative ownership are shared with the tenant, but in another, that tenant has no ‘ ‘ proprietary lease ’ ’ but stands at arm’s length in landlord-tenant relationship.
Contrary to landlord’s position, the lease does not per se make a violation of any rule or regulation a violation of a substantial lease obligation. The provisions of article fourth, paragraph 15, concerning compliance with all now existing or hereafter enacted rules and that violation of such rules is to be considered a violation of a substantial obligation of occupancy, are too broad and undefined in scope. They leave untrammeled power in the landlord’s directors and would compel tenants to an absolute pledge of compliance without the slightest knowledge of the rule. Such autocracy should not be encouraged. Allowing landlord and tenants to agree as to Avhat constitutes a substantial obligation of a lease, no matter how trivial or unreasonable it may be, would oust the courts from jurisdiction.
In Hilltop Vil. Co-op. No. 4 v. Goldstein (41 Misc 2d 402), where there was a flagrant violation of a regulation against harboring a dog, the court refused to find that there had been a breach of a substantial obligation but indicated it might have ruled differently if the parties had expressly agreed that such conduct would be deemed a substantial violation. A provision *1048 authorizing termination for failure to comply with a specific, designated regulation or restriction might warrant eviction of a tenant without inquiring into the facts and circumstances (see L. H. Estates v. Bartholomew, 9 Misc 2d 116, affd. 5 A D 2d 815), although the extent to which such private arrangements should be countenanced remains an open question. However, where, as in the present case, the provision is of the blanket, blunderbuss variety, covering all imaginable behavior which may now or later be prohibited, enforcement would amount to abdication of the judicial function.
The court interprets the language of article fourth, paragraph 15, as an attempt to regulate the rights of the parties which is not binding on the courts. All the circumstances and facts may be taken into consideration and, if then the aggregate effect of these factors and the violation is detrimental to the health and welfare of the other tenants or the landlord’s property is destroyed, befouled or otherwise depreciated, a court may hold that a “ violation of a substantial obligation of occupancy ” has occurred.
The mere harboring of a dog in violation of the terms of the lease is not per se a basis for terminating the lease and evicting the tenant without a showing that the dog is a nuisance to the landlord or other tenants because of repeated acts which interfere with their enjoyment and use of the property. (Jerome Realty Co. v. Yankovich, 35 Misc 2d 183; Parkside Development Co. v. McGee, 21 Misc 2d 277; Kingsway-14th Bldg. Corp. v. Flickstein, 234 N. Y. S. 2d 812; Hardav Realty Corp. v. Donahue, 8 Misc 2d 951; Smith Real Estate v. Byrne, 3 Misc 2d 559.)
The decision in Knolls Co-op. Section No. II v. Cashman (N. Y. L. J., March 5, 1963, p. 17, col. 3, affd. 19 A D 2d 789, affd. 14 N Y 2d 579) has no application. The action there was for a declaratory judgment and involved the question of whether the rule adopted was valid and reasonable and' whether it should be applied under entirely different circumstances than are shown here. The fact that the prohibition was against ownership of animals acquired after a certain date, permitting those in a position similar to these tenants to retain their animals, is sufficient to distinguish the cases.
There is not the slightest claim here that tenant’s animal is obnoxious, vicious, or has caused any embarrassment or damage to landlord’s property or to other tenants.
The provisions of article fourth, paragraph 15, rule and regulation 16, that no animal of any kind shall be kept or harbored in the demised premises is a commonplace rule, found substan *1049 tially in every lease in New York City covering apartments. If it were literally enforced there would be wholesale evictions. The court suggests that even a canary, a parakeet, goldfish or other pets or animals would be covered and thus literally even humans, who are of the 1 ‘ animal world ’ ’, would be ousted.
There was testimony that many tenants in this huge project kept dogs, cats and other pets and that no effort was ever made to oust them. It must be remembered that the lease and other documents were drawn by the landlord. The tenants signed the lease under conditions of economic duress which forced them to accept a provision therein which under normal circumstances they would never have agreed to.
The tenants had no knowledge of the provision in the lease prohibiting animals when they tendered the down payment on the apartment in 1959. Between that time and October, 1962, the landlord chose not to divulge the contents of the lease. They were ultimately notified of the prohibition in late October, 1962, by which time they had completed arrangements to move and were merely waiting for notice of completion of the apartment. At that time they were neither in a position to remain in their old apartment nor able to obtain other quarters without great personal sacrifice. Their only practical solution was to sign the lease.
Here is a clearly defined case of economic coercion inducing contractual assent. The courts of this State have consistently applied the doctrine and have freed parties from contractual obligations which they were forced to incur because of economic pressure which, as in the present case, was such as to render the parties contractual assent coerced and hence involuntary. (Gallagher Switchboard Corp. v. Heckler Elec. Co., 34 Misc 2d 256; Wou v. Galbreath-Ruffin Realty Co., 22 Misc 2d 463; Elman v. Brown, Harris, Stevens, 286 App. Div. 247.)
Finally, it appears that since December 24,1962, tenants have had their dog in the apartment openly and notoriously. A letter was written calling the attention of the landlord to the presence of the dog. No reply was received nor did landlord take any action. On the contrary, it accepted tenants’ rent for many months. Under these circumstances, the provision in the lease prohibiting animals was clearly waived. (Valentine Gardens Coop. v. Oberman, 237 N. Y. S. 2d 535; Woollard v. Schaffer Stores Co., 272 N. Y. 304.)
The animal in question is a pedigreed dachshund which had been with the tenants for 11 years. The tenants were deeply attached to it and it is the beloved playmate of their children *1050 and grandchildren. Such attachment reminds one of the sentimental, warm and charming words of Stephen Foster, famed American folk song writer:
“ Old dog Tray’s ever faithful;
Grief can not drive him away;
He is gentle, he is kind —
I shall never, never find
A better friend than old dog Tray! ”
“ Clearly, the resulting prejudice and anguish to defendants [in removing the animal] far outweighs the relatively inconsequential, transitory [and dubious] benefit to the other cooperative tenants” (Valentine Gardens Coop. v. Overman, supra, pp. 538-539).
Paragraph fifth of landlord’s lease, requiring waiver to be in writing, is not exclusive. (Sol Apfel, Inc. v. Kocher, 61 N. Y. S. 2d 508, affd. 272 App. Div. 758; Trent v. Corwin, 76 N. Y. S. 2d 198.)
Landlord, by its acts and conduct, made an election and is now estopped from reversing its position in mid-stream. The petition is dismissed.